1  DENNIS K. BURKE
   United States Attorney
2  District of Arizona

3  DOMINIC LANZA
   California State Bar No. 225989
4  Dominic.Lanza@usdoj.gov
   RAYMOND K. WOO
5  Arizona State Bar No. 023050
   Raymond.Woo@usdoj.gov
6  Assistant U.S. Attorneys
   Two Renaissance Square
7  40 N. Central Avenue, Suite 1200
   Phoenix, Arizona 85004-4408
8  Telephone (602) 514-7500

9              UNITED STATES DISTRICT COURT

10                 DISTRICT OF ARIZONA

11 | United States of America,        |
12 |              Plaintiff,          | No. CR 08-255-PHX-GMS
13 |         v.                       | **UNITED STATES' COMBINED
   |                                  | OBJECTIONS TO PRESENTENCE
14 | 1.  Jeffrey Crandell,            | REPORTS**
15 | 2.  Jake Whitman,                | Sentencing Date:  March 22, 2010
16 | 5.  Fred Crum,                   |
17 |                                  |
18 |              Defendants.         |

       This case involves a sophisticated mortgage fraud conspiracy.  All told, it

encompassed at least 17 properties and duped a federally-insured bank, Marshall & Ilsley

Bank ("M&I Bank"), to lend over $6.4 million based on false mortgage applications.  The

defendants named above have pleaded guilty, and sentencing is set for March 22.

       The Probation Office has now issued a presentence report ("PSR") for each defendant.

This memorandum sets forth the government's objections to the various PSRs for Jeffrey

Crandell, Jake Whitman, and Fred Crum.

For sake of efficiency and consistency between defendants, the government believes it is most logical to file all of its PSR objections in a single memorandum (rather than file individual sets of objections).  As discussed below, this is because nearly all of the government's objections concern issues that require consideration of the overall scope of the scheme, such as (1) the *role-related adjustments* that, in the government's view, should be applied to reflect each defendant's relative level of involvement, (2) the applicability of the *sophisticated-means enhancement* to certain defendants, and (3) the methodology for calculating the *loss amounts* for certain transactions.

This memorandum is divided into four sections.  Section I provides an overview of how the underlying scheme worked.  Section II identifies which defendants were involved with, and the "loss amount" associated with, each of the 17 individual transactions at issue in this case.  Building on this analysis, Section III provides the government's objections to the PSRs concerning the issues of role adjustments, sophisticated means, and loss amounts. Finally, Section IV sets forth the government's objection on one additional, defendant-specific issue.

I.    **OVERVIEW:  HOW THE SCHEME WORKED.**

Defendants Jeffrey Crandell ("CRANDELL") and Jake Whitman ("WHITMAN") were the leaders and organizers of the scheme.  Both worked as mortgage brokers at a company called Academy Mortgage.   The remaining defendants—Erin Leastman ("LEASTMAN"), Fred Crum ("CRUM"), and Tyson Young ("YOUNG")—played secondary roles.  The scheme generally worked as follows:

A.    The Land.

First, either CRANDELL or WHITMAN would obtain the rights to a parcel of vacant, undeveloped land.  The scheme ultimately encompassed three such parcels:  One in Chandler (near Chandler Heights), one in Queen Creek (on San Tan Boulevard), and one near Gilbert

1  (on East Stacey Road).  The cost of each one-acre lot within these parcels was generally

2  between $220,000 and $320,000, depending on location.

3    After obtaining the land, CRANDELL and WHITMAN took steps to hide their

4  financial interest in the lots.  CRANDELL did so by using quit-claim deeds to place the lots

5  in the name of his brother-in-law, YOUNG.  WHITMAN did so by placing his lots into

6  various corporate shells.  The purpose of this deception was to dupe buyers into thinking that

7  CRANDELL and WHITMAN were simply acting as their mortgage brokers and didn't have

8  an ownership stake in the underlying land.

9    B. The Inflated Appraisals.

10    CRANDELL and WHITMAN hired the same hand-picked appraiser, Kurt Holm, to

11  appraise each lot.[1]  They told Holm their desired sales price and Holm complied, appraising

12  the lots for $500,000 or more.

13    These valuations were inflated.  The lots were vacant and undeveloped—many lacked

14  even basic utilities such as water, electric, and sewage—and were surrounded by lots that had

15  sold for as little as $200,000 during the same time period.  To overcome these factors, Holm

16  included false information in his appraisal reports.

17    C. The False Loan Applications.

18    CRANDELL and WHITMAN recruited friends and family members to buy the lots

19  for these inflated prices.  The targets were, for the most part, unsophisticated when it came

20  to real estate.  CRANDELL's and WHITMAN's sales pitch was that the buyers could obtain

21  "zero down" mortgage financing and also would receive "cash back" at closing.

22

23

24

25

26    [1] Although Holm was originally named as a defendant in this case, the government dismissed the charges against him in the interests of justice.  *See* CRs 173, 177.

This promise of zero-down financing was false.  In fact, under the applicable loan programs, M&I Bank[2] required borrowers to make a down payment of at least 20% or 25% of the purchase price—that is, $100,000 or more on a $500,000 property.  The bank also required this down-payment money to come from the borrower.  The purpose of this requirement was simple:  From the bank's perspective, it was important for the *borrower* to have equity in the property, which creates an incentive to keep making mortgage payments (rather than abandon the property) if market conditions deteriorate.

As mortgage brokers, CRANDELL and WHITMAN were responsible for preparing the buyers' loan applications.  (CRUM, another mortgage broker at Academy Mortgage, prepared one application and signed two others that had been prepared by WHITMAN.)  These applications were littered with lies.  Most notably, each application falsely stated that the *buyer* would be making the five- or six-figure down payment.  Most applications also included lies about (1) the buyer's income, (2) the buyer's assets, and/or (3) the buyer's intent to use the property as a primary residence (rather than as an investment).[3]  In some cases, CRANDELL and CRUM even altered the buyers' bank statements—to make it appear they had large account balances—and submitted these doctored statements to the lender.

Based on these lies, M&I Bank approved the loans.

---

[2]   Two counts in the indictment (5 and 8) relate to properties that were purchased via mortgage financing provided by a different bank (Towne Bank), but the government believes the evidence may not be sufficient to prove those misrepresentations were *material* to Towne Bank's lending decision.  Therefore, as noted in Part III *infra*, the government does not seek to include the Towne Bank properties in the loss calculations.

[3]   This lie was significant.  Banks prefer to extend mortgage financing to borrowers who plan to live on the subject property, for the obvious reason that such borrowers are less likely than investor-borrowers to walk away from the property (and default on the mortgage) if property values deteriorate.

D.   The Payment Of The Down Payment By The Seller.

The same escrow agent, LEASTMAN, handled the closing process for each loan (except for one loan in which LEASTMAN was the purchaser).  As noted, the bank's expectation—based on the loan application—was that the *buyer* would be making a 20% or 25% down payment at closing.  But the closing process didn't work this way.  Instead, CRANDELL or WHITMAN would purchase a cashier's check of approximately $100,000 (*i.e.,* the down payment amount), write the name of the borrower on the "purchased by" line of the check, and give the check to LEASTMAN.  LEASTMAN would, in turn, falsely certify to the bank that the buyer had deposited the down payment.  Based on this false certification, the bank would authorize the release of the loan proceeds.

E.   The Kickback.

As noted, CRANDELL and WHITMAN promised buyers they would receive "cash back" at closing—about $15,000—to use toward the mortgage payments.   In many cases, CRANDELL or WHITMAN personally met with the buyer to provide this payment.

F.   The Scheme Falls Apart.

CRANDELL and WHITMAN promised that, after closing, the lots would be improved with utilities, roads, and other amenities.  For the most part, this never happened.  Buyers complained, but CRANDELL and WHITMAN eventually stopped returning their calls.  The lots remained vacant and unimproved.

The scheme eventually fell apart.  Most of the buyers had modest incomes and could only afford to make the mortgage payments on their *own* homes—not an additional mortgage payment on a half-million-dollar dirt lot.  Although buyers generally were able to make a few months' worth of mortgage payments by using the $15,000 kickback money, that money inevitably ran out. (Several buyers, after exhausting the kickback money, also depleted their own savings accounts and even borrowed from family members in an attempt to keep up with the mortgage payments.)

G.   The Losses.

M&I Bank eventually disposed of the 17 mortgages in three different ways.

*First*, in five instances, M&I Bank kept the nonperforming mortgage on its books until the underlying property went into foreclosure.  In 2009, these properties were sold at foreclosure sales for between $25,000 and $87,000 each, causing M&I Bank to suffer massive losses.

*Second*, in seven instances, the borrower was able to obtain a subsequent "construction loan" from another bank for the purpose of developing the property.  In these cases, the buyers used a portion of the construction loan to pay off the original loan from M&I Bank.  Thus, although most of these buyers eventually defaulted on the *construction* loan payments, M&I Bank avoided suffering any actual loss.

*Third*, in the remaining five instances, M&I Bank persuaded Academy Mortgage to "buy back" the nonperforming loan.[4]  Those properties (all of which happen to be located in the Queen Creek subdivision) remain on Academy Mortgage's books to this day and have a current estimated value of about $40,000 each.[5]  Thus, in these cases, Academy Mortgage—rather than M&I Bank—has suffered a financial loss.  (As noted *infra*, the government's position is that the losses suffered by Academy Mortgage should be included in the loss calculations in this case.)

---

[4]    These "buy backs" occurred at the conclusion of an internal investigation by M&I Bank into its portfolio of loans brokered by Academy Mortgage.  M&I Bank launched this inquiry after it came to realize that a disproportionately high proportion of its Academy-brokered mortgages were defaulting.

[5]    This estimate is derived from a March 2, 2010, conversation with Duane Shaw of Academy Mortgage.  Mr. Shaw stated that the estimate was based, *inter alia*, on a recent tax assessment of the properties (which assessed them at $40,000) and the fact that the highest present listing of any comparable property in the area is for $39,999.

1       Of course, financial measures alone do not capture the magnitude of the harm in this

2   case.  Many of the individuals purchasers of the lots—the friends and family members who

3   CRANDELL and WHITMAN seduced with promises of zero-down financing and cash back

4   at closing—have been devastated.  They have been driven into bankruptcy and economic

5   collapse and have suffered severe emotional damage.

6       H.    The Lundin Transactions:  A Case Study.

7       The experiences of one victim—John Lundin—typify how this scheme worked and

8   the damage it has wrought.  Because it would be redundant to summarize the particulars of

9   each of the 17 fraudulent transactions, Mr. Lundin's experiences are described below to

10  provide the Court with a concrete sense of how the scheme operated.

11      John Lundin is an electronics salesman who eventually purchased two of the lots at

12  issue in this case: (1) Lot 4, Parcel B in Chandler Heights for $560,000, and (2) Lot B-5 in

13  Queen Creek for $435,000.  His involvement began in 2005, when he mentioned to a co-

14  worker that he was interested in buying an investment property.  The co-worker put Lundin

15  in touch with CRANDELL, who steered Lundin toward one of the Chandler Heights lots.

16  (Lundin had no idea CRANDELL had a hidden financial interest in the property.)

17  CRANDELL told Lundin he could purchase the lot without putting any money down and

18  also would receive $15,000 at closing.  In response, Lundin told CRANDELL he was

19  concerned that he might not qualify for a mortgage due to his low income and assets.

20      Lundin relied on CRANDELL to prepare his loan paperwork.  Lundin told

21  CRANDELL he made about $40,000 per year and had about $5,000 in assets.  He also gave

22  CRANDELL a copy of various bank statements.  CRANDELL prepared the initial

23  application and asked Lundin to sign it.  Lundin signed but didn't inspect the application

24  closely.

25      CRANDELL included multiple lies in the application.  Among other things, the

26  application stated that Lundin earned a monthly income of $9,500; that Lundin had over

7

1   $200,000 in his checking account; and that Lundin would be using the property as his

2   primary residence.

3        M&I Bank approved a loan.  At closing, Lundin arrived at Stewart Title, met with

4   LEASTMAN, and signed the final loan application.  This application again

5   stated—falsely—that Lundin had over $200,000 in his checking account and intended to use

6   the property as his primary residence.  It also stated—falsely—that Lundin would make a

7   down payment of over $130,000 toward the $560,000 purchase price.

8        In fact, Lundin didn't present a down payment at closing.  Instead, LEASTMAN

9   falsely certified to M&I Bank that the down payment had been deposited by Lundin, which

10  enabled her to disburse the loan proceeds the "seller" of the property (*i.e.,* a shell company

11  controlled by WHITMAN).  At this point, LEASTMAN and WHITMAN went to a local

12  Bank of America branch, where WHITMAN used the loan proceeds to purchase a six-figure

13  cashier's check made out in Lundin's name.  LEASTMAN immediately returned to the

14  escrow office and placed this check in the file.  This made it *appear* that Lundin had

15  deposited the check in the first place.  Finally, LEASTMAN generated a fake receipt

16  indicating that Lundin had made the deposit.

17       After closing, Lundin received a $15,000 kickback.  Lundin used all of this money,

18  as well as $20,000 of his own money, to make the initial mortgage payments.  Ultimately,

19  Lundin was able to secure a construction loan from another bank, which enabled him to pay

20  off the initial loan from M&I Bank.  Nevertheless, the property eventually went into

21  foreclosure.

22       CRANDELL also persuaded Lundin to buy one of the Queen Creek lots.  Once again,

23  CRANDELL promised that, notwithstanding the property's high price ($435,000), Lundin

24  could buy with no money down and also receive cash back.

25       Just as before, CRANDELL filled out the loan application on Lundin's behalf.  It

26  included lies about Lundin's income ($9,500 per month), assets (over $200,000), the source

of the down payment (Lundin), and Lundin's purported desire to use the property as his primary residence.  Lundin did not sign the application and was unaware of these lies.

CRANDELL also submitted fake financial statements to M&I Bank in support of Lundin's application.  For example, M&I Bank was provided with what *appeared* to be a copy of Lundin's 401K statement.  That document showed a balance of over $133,000.  In fact, Lundin had only $3,000 in his 401K account.  (Lundin had provided an accurate copy of his 401K statement to CRANDELL and had no clue how the fake statement wound up in M&I Bank's files.)  CRANDELL also submitted a doctored Wells Fargo account statement that *appeared* to reflect a $172,500 home equity line.  In fact, Lundin had only a $75,000 home equity line and provided his true account statement to CRANDELL.

Based on all of this, M&I Bank approved the application.  At closing, Lundin once again showed up at Stewart Title and signed the final loan application.  This application stated—falsely—that Lundin had $366,000 in liquid assets, would use the property as his primary residence, and would make a large down payment.  LEASTMAN again generated a fake down payment receipt suggesting that Lundin had, in fact, made a $90,000 down payment, even though CRANDELL was the person who actually supplied the down payment.

Afterward, Lundin received another $15,000 kickback.  After the money ran out, the property went into foreclosure.  It was sold at a foreclosure sale in 2009 for $87,000.

II.    **TRANSACTION-BY-TRANSACTION   ANALYSIS   OF   DEFENDANT INVOLVEMENT AND LOSS AMOUNT.**

A.    Chandler Heights (Three Transactions).

1.    **Defendant Involvement**.

In 2005, WHITMAN obtained the rights to several undeveloped lots located in Chandler.  He paid about $320,000 per lot.  The lots were placed in the name of a corporate entity called "Pinnacle Investment Properties, Inc." to conceal WHITMAN's interest.

WHITMAN's plan was to flip the lots for a profit, but he had trouble locating buyers. He thus decided to enlist CRANDELL, a friend and co-worker, to assist with the scheme. They agreed that, in return for a 50/50 split of the profits, CRANDELL would be responsible for locating buyers and processing their loan applications. CRANDELL located two buyers (Lundin and LEASTMAN) and prepared fraudulent loan applications on their behalf.

CRUM, another broker at Academy Mortgage, also agreed to participate in the scheme. At the behest of his boss WHITMAN, who promised to pay him a $15,000 "finder's fee," CRUM located one buyer (Jeffrey Hesting) and prepared a fraudulent loan application on Mr. Hesting's behalf. CRUM was not, however, involved in the other two Chandler Heights transactions.

LEASTMAN was involved in all three transactions. In addition to acting as the buyer of one Chandler Heights lot (and signing a mortgage application that she knew contained false information), LEASTMAN acted as the escrow agent in the other two transactions. In this role, she falsely certified that the buyer had presented the down payment even though she knew that WHITMAN had simply purchased a down payment check on the buyer's behalf.

In sum, CRANDELL, WHITMAN, and LEASTMAN were involved in all three Chandler Heights transactions. CRUM was involved in only one transaction. YOUNG had no involvement whatsoever.

2. **Loss Amounts**.

Calculating the "loss amount" for the three Chandler Heights properties is relatively simple. As discussed below, in two cases, the borrower was able to obtain a construction loan and used the proceeds to pay off the initial loan from M&I Bank. In the other case, M&I Bank eventually sold the property at a foreclosure sale for a substantial loss.

_____ • Lot 3, Parcel A: This transaction, which involved a loan of $410,400 to Jeffrey Hesting, did not result in an actual loss to M&I Bank. Mr. Hesting obtained a construction loan from another bank, which he used to pay off the loan from M&I Bank. Accordingly,

the relevant "loss amount" under the Sentencing Guidelines (*see* Part III.C *infra*) is actually the *gain* the defendants sought to derive from the transaction.  That figure is $75,400, which represents the loan proceeds ($410,400) minus the cost of the underlying land ($320,000) minus the $15,000 kickback.

• Lot 3, Parcel B:  This transaction, which involved a loan of $444,000 to LEASTMAN, resulted in an actual loss to M&I Bank.  The property was sold at a foreclosure sale in 2009 for $82,870.  As a result, M&I Bank suffered a loss of $361,130.

• Lot 4, Parcel B:  This transaction, which involved a loan of $448,000 to Mr. Lundin, did not result in an actual loss to M&I Bank.  As noted, Mr. Lundin obtained a construction loan that he used to pay off M&I Bank.  Accordingly, the relevant "loss amount" is the defendants' gain of $113,000.

    B.   Queen Creek (Seven Transactions).

        1.   **Defendant Involvement**.

The Queen Creek deal was similar in concept to the Chandler Heights deal but involved different players.  CRANDELL was the architect and principal in this deal. WHITMAN had little if any involvement.  Neither did CRUM.

    The scheme began when CRANDELL acquired the rights to nine vacant, undeveloped lots located in the same subdivision in Queen Creek.  His cost basis was about $225,000 per lot, but he persuaded Holm to appraise the lots for between $400,000 to $500,000 each. (Although CRANDELL succeeded in selling all nine lots, only seven of the purchases were funded via mortgage financing by M&I Bank.  The remaining two were funded by Towne Bank.  As noted in footnote 2 *supra*, the government does not believe the Towne Bank transactions should be included in the loss amounts in this case.  Therefore, only the seven M&I Bank transactions are discussed below.)

    CRANDELL approached his brother-in-law, YOUNG, to see if he'd be interested in earning some extra money by posing as the owner of the lots.  (YOUNG had no experience

in real estate and was working at Taco Bell at the time.)   When YOUNG agreed to participate, CRANDELL arranged for the lots to be placed in YOUNG's name via quit-claim deeds.

Having obscured his interest in the lots, CRANDELL solicited friends and acquaintances to buy them as investments. Just as in the Chandler Heights deal, he promised zero-down financing and cash back at closing.   The prospective buyers believed that CRANDELL was simply acting as their mortgage broker and had no idea he owned the underlying land.

As the mortgage broker, CRANDELL filled out the buyers' loan applications.   The applications falsely stated that the buyer would be making a down payment of 20% or more. Many applications also included lies about the buyers' income, assets, and intent to use the property as a primary residence.

LEASTMAN acted as the escrow agent for all of the Queen Creek transactions. CRANDELL supplied the down payment by purchasing a cashier's check in the name of the buyer and giving the check to LEASTMAN.   In turn, LEASTMAN would prepare a fake receipt to make it appear the buyer had deposited the check.

CRANDELL also instructed his brother-in-law, YOUNG, to travel to the escrow office to sign the closing documents.   After closing, CRANDELL would give YOUNG a small payment for his assistance.   He paid YOUNG a total of about $7,000 over the course of the scheme.

After closing, CRANDELL paid the buyers a kickback of about $15,000 per lot. Despite this, all seven Queen Creek properties eventually went into default.

In sum, CRANDELL, YOUNG, and LEASTMAN were involved in all seven Queen Creek transactions.   WHITMAN and CRUM had no involvement in these transactions.

1          2.   **Loss Amounts**.

2          Calculating the "loss amount" for the seven Queen Creek properties is complicated

3     by the fact that M&I Bank disposed of these properties in three separate ways.  As discussed

4     below, in one case (Lot B-4), the borrowers were able to obtain a construction loan before

5     defaulting, which they used to pay off the initial loan from M&I Bank.  In another case (Lot

6     B-5), M&I Bank kept the nonperforming loan on its books until 2009, when the property was

7     sold at a foreclosure sale for a significant loss.  Finally, in the remaining five cases (Lots A-1,

8     B-2, A-2, A-3, and A-4), Academy Mortgage agreed to "buy back" the nonperforming loans

9     from M&I Bank.  Those properties remain on Academy Mortgage's books to this day and

10    are valued at about $40,000 each.

11         • Lot A-1:  This transaction, which initially involved a loan of $311,500 to Ty Van

12    Haren, resulted in an actual loss to Academy Mortgage.  As part of the "buy back" program,

13    Academy Mortgage purchased this loan from M&I Bank for $367,101.  The property remains

14    on Academy Mortgage's books and has a current estimated value of $40,000.  Therefore, the

15    relevant "loss amount" is $327,101, which represents the price paid by Academy ($367,101)

16    minus the current value ($40,000).

17         • Lot B-5:  This transaction, which involved a loan of $348,000 to Mr. Lundin,

18    resulted in an actual loss to M&I Bank.  As noted, the property was sold at a foreclosure sale

19    in 2009 for $87,000.  Therefore, M&I Bank's resulting loss was $261,000.

20         • Lot B-4: This transaction, which involved a loan of $356,000 to Shawn and Ty Van

21    Haren, did not result in an actual loss to M&I Bank.  The borrowers were able to obtain a

22    construction loan and used the proceeds from that loan to pay off the original mortgage.  The

23    relevant "loss amount" is thus the defendants' gain of $120,780, which represents the loan

24    amount minus the cost of the land ($220,000) minus the kickback ($15,000).

25         • Lot B-2:  This transaction, which initially involved a loan of $340,000 to Josh

26    Frazier, resulted in an actual loss to Academy Mortgage.  As part of the "buy back" program,

Academy Mortgage purchased this loan from M&I Bank for $383,749. It has a current estimated value of $40,000. Therefore, the relevant "loss amount" is $343,749.

• Lot A-2: This transaction, which initially involved a loan of $356,000 to Josh Frazier, also resulted in an actual loss to Academy Mortgage. As part of the "buy back" program, Academy Mortgage purchased this loan from M&I Bank for $401,256. It has a current estimated value of $40,000. Therefore, the relevant "loss amount" is $361,256.

• Lot A-3: This transaction, which initially involved a loan of $348,749 to Philip Rogers, also resulted in an actual loss to Academy Mortgage. As part of the "buy back" program, Academy Mortgage purchased this loan from M&I Bank for $392,362. It has a current estimated value of $40,000. Therefore, the relevant "loss amount" is $352,362.

• Lot A-4: This transaction, which initially involved a loan of $400,800 to Philip Rogers, resulted in yet another actual loss to Academy Mortgage. As part of the "buy back" program, Academy Mortgage purchased this loan from M&I Bank for $444,333. It has a current estimated value of $40,000. Therefore, the relevant "loss amount" is $404,333.

C.   Gilbert (Seven Transactions).

1.   **Defendant Involvement**.

In the Gilbert deal, WHITMAN acquired several adjacent, undeveloped lots. To obscure his ownership, WHITMAN arranged for the properties to be placed in the name of a corporate shell called "Whitcock Properties." He also persuaded Holm to appraise the properties for around $500,000 each.

When recruiting buyers, WHITMAN made the same promise of zero-down financing and cash back at closing that had proved so successful in the Chandler Heights venture. In this case, moreover, the buyers were relatives and family friends who, due to their trust in WHITMAN, often signed the fraudulent loan documents (which, *inter alia*, falsely stated that the buyer would be making the six-figure downpayment) without carefully reviewing them.

Although WHITMAN prepared all of the loan applications, he was only identified as the mortgage broker on five of them. In the other two cases, WHITMAN asked CRUM to pose as the mortgage broker because the borrowers (Leslie Whitman and Joanne & Robert Whitman) were direct relatives and shared his last name. (WHITMAN feared that M&I Bank would reject the loan applications if it knew the mortgage broker and borrowers were related.) CRUM agreed to participate in this deception and signed the applications as the broker of record.

M&I Bank approved the applications. Once again, LEASTMAN agreed to serve as the escrow agent. At closing, she again falsely certified that the buyers had presented the down payment, even though it actually had been provided by WHITMAN.

The Gilbert deal collapsed, after closing, in the same manner as the Chandler Heights and Queen Creek deals. Although the buyers used their $15,000 kickback money to make the initial mortgage payments, the money eventually ran out.

In sum, WHITMAN and LEASTMAN were involved in all seven Gilbert transactions. CRUM was involved in two transactions. CRANDELL and YOUNG had no involvement.

## 2. **Loss Amounts**.

Calculating the "loss amount" for the seven Gilbert properties is simple. As discussed below, in four cases, the borrower was able to obtain a construction loan and used the proceeds to pay off the initial loan from M&I Bank. In the other three cases, M&I Bank eventually sold the property at a foreclosure sale for a substantial loss.

• Lot 4, Parcel A: This transaction, which involved a loan of $393,647 to Karl Baker, did not result in an actual loss to M&I Bank. That loan was paid off by a subsequent construction loan. The relevant "loss amount" is therefore the gain of $143,647, which represents the loan amount minus the cost of the land ($235,000) minus the kickback ($15,000).

1    • <u>Lot 5, Parcel A</u>:  This transaction, which involved a loan of $397,447 to Shawn &

2    Melanie Morris, resulted in an actual loss to M&I Bank.  The property was sold at a

3    foreclosure sale in 2009 for $28,693.  Therefore, M&I Bank's resulting loss was <u>$368,754</u>.

4    • <u>Lot 3, Parcel A</u>:  This transaction, which involved a loan of $393,697 to Joanne &

5    Robert Whitman, did not result in an actual loss to M&I Bank because the loan was paid off

6    via a construction loan before foreclosure.  The relevant "loss amount" is thus the

7    defendants' gain of <u>$143,697</u>.

8    • <u>Lot 1, Parcel A</u>:  This transaction, which involved a loan of $393,697 to Scott

9    Genta, did not result in an actual loss to M&I Bank because the mortgage was paid off via

10   a construction loan.  The relevant "loss amount" is thus the defendants' gain of <u>$143,697</u>.

11   • <u>Lot 5, Parcel B</u>:  This transaction, which involved a loan of $397,447 to Leslie

12   Whitman, resulted in an actual loss to M&I Bank.  The property was sold at a foreclosure

13   sale in 2009 for $37,701.  Therefore, M&I Bank's resulting loss was <u>$359,746</u>.

14   • <u>Lot 2, Parcel A</u>:  This transaction, which involved a loan of $393,697 to Olga

15   Abegg, resulted in an actual loss to M&I Bank.  The property was sold at a foreclosure sale

16   in 2009 for $26,946.  Therefore, M&I Bank's resulting loss was <u>$366,751</u>.

17   • <u>Lot 1, Parcel B</u>:  This transaction, which involved a loan of $367,450 to Ronald

18   Decker, did not result in an actual loss to M&I Bank because the mortgage was paid off via

19   a construction loan before foreclosure.  The relevant "loss amount" is thus the defendants'

20   gain of <u>$117,450</u>.

21   ///

22   ///

23   ///

24

25

26

16

1    III.    **OBJECTIONS CONCERNING THE OVERALL SCHEME.**

2         A.    Role Adjustments.

3               1. **Leader/Organizer Enhancement**.

4         With respect to both WHITMAN and CRANDELL. the Court should impose a four-

5    level enhancement under U.S.S.G. § 3B1.1(a), which authorizes such an enhancement "[i]f

6    the defendant was an organizer or leader of a criminal activity that involved five or more

7    participants or was otherwise extensive." *Id.* Currently, the PSR characterizes WHITMAN

8    and CRANDELL as "average" participants and thus does not recommend any role-related

9    adjustments. *See* PSR ¶ 12.

10        As a threshold matter, section 3B1.1(a) may be applied here because the underlying

11   scheme "involved five or more participants or was otherwise extensive." Indeed, five

12   persons have pleaded guilty in this case alone. What's more, although the charges against

13   the appraiser (Holm) were ultimately dropped in the interests of justice, the application notes

14   to section 3B1.1 make clear that Holm, too, may qualify as a sixth "participant." *See id.* note

15   1 ("A 'participant' is a person who is criminally responsible for the commission of an

16   offense, but need not have been convicted."). Finally, although none of the *borrowers* in this

17   case (except for LEASTMAN) was criminally charged, their participation also supports

18   application of section 3B1.1(a) because it shows that the scheme was "extensive." *See*

19   U.S.S.G. § 3B1.1, note 3 ("In assessing whether an organization is 'otherwise extensive,' all

20   persons involved in the entire offense are to be considered. Thus, a fraud that involved only

21   three participants but used the unknowing services of many outsiders could be considered

22   extensive.").

23        On the merits, both WHITMAN and CRANDELL qualify as an "organizer or leader"

24   because they oversaw the execution of the scheme, exercised decision making authority,

25   recruited others to assist in the scheme, and—perhaps most important—stood to collect the

26   profits. *See* U.S.S.G § 3B1.1, note 4 ("Factors the court should consider include the exercise

17

of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, [and] the claimed right to a larger share of the fruits of the crime . . . ."). For example:

• With respect to the Chandler Heights properties, WHITMAN created the scheme and then persuaded CRANDELL to join as a 50/50 equity partner. WHITMAN also recruited CRUM and LEASTMAN to assist in the scheme's execution, arranged others' compensation, and directed others' actions.

• With respect to the Queen Creek properties, CRANDELL assumed the leader/organizer role. Acting on his own, CRANDELL acquired the underlying properties; recruited and negotiated a flat-fee payment to the straw owner (YOUNG); enlisted the assistance of the escrow agent (LEASTMAN); personally oversaw the falsification of the borrowers' mortgage applications (in some instances even creating fake banking statements to corroborate the lies in the applications); and stood to reap all of the profits.

• Finally, as for the Gilbert properties, WHITMAN again acted as the leader/organizer, recruited CRUM and LEASTMAN, and stood to collect all of the profits.

In short, both men plainly deserve the leader/organizer enhancement under these circumstances. U.S.S.G. § 3B1.1, note 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."); *United States v. Brodie*, 524 F.3d 259, 270 (D.C. Cir. 2008) (affirming four-level leader/organizer enhancement in mortgage fraud case because the defendant "recruited individuals with specialized skills to facilitate his scheme," "coordinated the group's efforts and directed them in the performance of their respective tasks," and "paid the other participants flat fees for their services . . . and kept the 'fruits of the crime' (the loan proceeds) for himself").[6]

---

[6]    At a minimum, the Court should impose a three-level enhancement under section 3B1.1(b), which applies to "a manager or supervisor (but not an organizer or leader)" of a criminal scheme involving five or more participants. Although both WHITMAN and

1          B.    Sophisticated Means.

2          The Court also should impose a two-level "sophisticated means" enhancement against

3    WHITMAN and CRANDELL.  *See* U.S.S.G. § 2B1.1(9)(C) ("If . . . the offense otherwise

4    involved sophisticated means, increase by 2 levels.").  As noted in Sections I and II *supra*,

5    the scheme devised by WHITMAN and CRANDELL was extremely sophisticated and

6    involved multiple layers of deception.  Among other things, WHITMAN and CRANDELL

7    hid their ownership interest in the underlying properties through the use of quit-claim deeds

8    and shell companies; created fake banking statements and other documents to corroborate

9    the lies contained in mortgage applications; bought cashier's checks in the name of the

10   buyers in order to mislead the lender about the true source of the funds; gave a $15,000 cash

11   kickback to buyers in order to ensure that initial mortgage payments were made; and enlisted

12   other trained professionals (including brokers, appraisers, and escrow agents) to create

13   additional layers of deception.

14         The combination of these sophisticated tactics easily warrants a two-level

15   sophisticated-means enhancement.  In fact, the use of even one such tactic is arguably

16   enough to trigger the enhancement.  *See, e.g.,* U.S.S.G. § 2B1.1, note 8(B) ("Conduct such

17   as hiding assets or transactions . . . through the use of fictitious entities [or] corporate shells

18   . . . ordinarily indicates sophisticated means."); *United States v. Wright*, 496 F.3d 371, 379

19   (5th Cir. 2007) ("We find no error in the finding that Wright used sophisticated means.

20   Depositing a check from someone else into your account, and then using that money to

21   purchase a cashier's check in someone else's name, are means [that are] sophisticated . . . at

22   least as part of a scheme to defraud a mortgage broker."); *United States v. Amico*, 416 F.3d

23   163, 169 (2d Cir. 2005) (creation of false bank documents and false appraisals, among other

24   facts, justified sophisticated-means enhancement).

25   _____

26   CRANDELL should be deemed organizers/leaders, they qualify as managers/supervisors too.

C.    Loss Amounts.

1.    **Methodology Objection:  Academy Mortgage "Buy Backs."**

With respect to the issue of loss amounts, the government disagrees in part with the Probation Office's methodology for calculating losses.  *See* PSR ¶ 11.  As noted, M&I Bank used three different mechanisms to dispose of the 17 nonperforming mortgages:

(1)    Foreclosure Sale:  In five instances, M&I Bank continued to hold the mortgage until the underlying property could be sold at a foreclosure sale;

(2)    Construction Loan:  In seven instances, the borrower paid off the initial mortgage by obtaining a construction loan from a different bank; and

(3)    Academy Mortgage "Buy Back":  In the final seven instances, M&I Bank persuaded Academy Mortgage to buy back the nonperforming mortgage.

With respect to the first category of properties, the Probation Office has calculated the "loss amount" by identifying the actual loss suffered by M&I Bank (*i.e.,* the size of the initial loan minus the amount recouped at the foreclosure sale).  *See* PSR ¶ 11.  By contrast, with respect to the second and third categories, the Probation Office has concluded that because M&I Bank did not suffer any loss, the relevant metric for "loss amount" purposes is the defendants' gain (*i.e.,* the loan proceeds minus the cost of the underlying land minus the $15,000 kickback).  *Id.*

The government agrees that the Probation Office's chosen methodology is correct with respect to the first and second categories of properties.  However, with respect to the third category, the government believes the proper measure is the actual loss Academy Mortgage suffered from the transactions, not the defendants' gain from the transactions.

This approach is supported by the application notes to U.S.S.G. § 2B1.1.  Application note 3(A) instructs that, in general, courts should select "the greater of actual loss or intended loss" when making loss calculations.  Application note 3(A)(i) further advises that "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.*

1   Finally, application note 3(B) acknowledges that courts may select the defendants' gain "as

2   an *alternative* measure of loss," but cautions that this alternative measurement should be used

3   "*only if*" the size of the loss cannot reasonably be determined.  *Id.* (emphasis added).

4          Applying these principles here, the Court should find that Academy Mortgage's losses

5   constitute the relevant "loss amounts" under section 2B1.1.  As note 3(A)(i) makes clear, it

6   does not matter *who* sustained the ultimate loss from the collapse of the mortgages—all that

7   matters is that harm "resulted from the offense" and was "foreseeable."  Put another way, the

8   defendants should not be allowed to escape liability simply because Academy Mortgage,

9   rather than M&I Bank, was left holding the toxic mortgages when the scheme finally

10  collapsed.  Because Academy Mortgage suffered actual, foreseeable, and easily calculated

11  losses as a result of the scheme, those losses (rather than the disfavored and "alternative"

12  measurement of the defendants' profits) should be utilized in the Guidelines calculations.

13                 **2.  Towne Bank Properties.**

14          As explained in footnote 2, the government believes the two Towne Bank properties

15  (lots B-2 and B-1 from Queen Creek) should be excluded from the loss calculus.

16                 **3.  Arithmetical Error.**

17          The government also notes that the Probation Office's loss calculations appear to

18  contain a simple typographical error with respect to Lot 2, Parcel A in the Gilbert

19  development (the second-to-last entry in the loss chart).  The loss amount for that property

20  should be $366,751, not $336,751.

21  ///

22  ///

23  ///

24

25

26

4.  **Overall Effect On Loss Calculations.**

If the Court were to accept all of the loss-related objections raised above, the final loss figures would be recalculated as follows.  (The loss amount associated with each transaction has been copied into the column of each individual defendant who participated in that transaction.  Defendants who did not participate in the transaction are denoted with a zero):

| Lot | Loss | Crandell | Whitman | Crum | Leastman | Young |
|-----|------|----------|---------|------|----------|-------|
| 3-A/CH | $75,400 | $75,400 | $75,400 | $75,400 | $75,400 | $0 |
| 3-B/CH | $361,130 | $361,130 | $361,130 | $0 | $361,130 | $0 |
| 4-B/CH | $113,000 | $113,000 | $113,000 | $0 | $113,000 | $0 |
| A-1/QC | $327,101 | $327,101 | $0 | $0 | $327,101 | $327,101 |
| B-5/QC | $261,000 | $261,000 | $0 | $0 | $261,000 | $261,000 |
| B-4/QC | $120,780 | $120,780 | $0 | $0 | $120,780 | $120,780 |
| B-2/QC | $343,749 | $343,749 | $0 | $0 | $343,749 | $343,749 |
| A-2/QC | $361,256 | $361,256 | $0 | $0 | $361,256 | $361,256 |
| A-3/QC | $352,362 | $352,362 | $0 | $0 | $352,362 | $352,362 |
| A-4/QC | $404,333 | $404,333 | $0 | $0 | $404,333 | $404,333 |
| 4-A/G | $143,647 | $0 | $143,647 | $0 | $143,647 | $0 |
| 5-A/G | $368,754 | $0 | $368,754 | $0 | $368,754 | $0 |
| 3-A/G | $143,697 | $0 | $143,697 | $143,697 | $143,697 | $0 |
| 1-A/G | $143,697 | $0 | $143,697 | $0 | $143,697 | $0 |
| 5-B/G | $359,746 | $0 | $359,746 | $359,746 | $359,746 | $0 |
| 2-A/G | $366,751 | $0 | $366,751 | $0 | $366,751 | $0 |
| 1-B/G | $117,450 | $0 | $117,450 | $0 | $117,450 | $0 |
| **TOTAL** | $4,363,853 | **$2,720,111** | **$2,193,272** | **$578,843** | **$4,363,853** | **$2,170,581** |

In other words, under the "loss chart" found in section 2B1.1(b)(1) of the Guidelines, CRUM should receive a 14-level enhancement because his loss figure exceeds $400,000 but

not $1,000,000;[7] WHITMAN should receive a 16-level enhancement because his loss amount exceeds $1,000,000 but not $2,500,000; and CRANDELL should receive an 18-level enhancement because his loss amount exceeds $2,500,000 but not $7,000,000.

To be clear, even if the Court were to accept these recalculated loss figures, there would be no need to revise the PSR's resulting *offense level* calculations for CRUM or WHITMAN. For these two defendants, the offense level calculation remains unchanged because the additional losses do not push them into a higher bracket of the Guidelines' loss chart. On the other hand, the recalculated figures do have the effect of pushing CRANDELL into a higher bracket. Thus, CRANDELL's offense level should be increased by +2.

D.     Overall Effect On Offense Level Calculations.

If the Court were to sustain the government's objections concerning each of the issues raised above, the overall effect on the offense level calculations would be as follows:

• As for CRANDELL, the PSR concludes that his net offense level is 21. For the reasons set forth above, the Court should add a +4 enhancement for acting as a leader/organizer, a +2 enhancement for using sophisticated means, and an additional +2 enhancement to reflect his recalculated loss amount (*i.e.,* his losses now exceed $2,500,000, so he deserves an 18-level enhancement rather than a 16-level enhancement). These changes, if accepted, would raise his offense level to **29**.

• As for WHITMAN, the PSR concludes that his net offense level is 20. For the reasons set forth above, the Court should add a +4 enhancement for acting as a leader/organizer and a +2 enhancement for using sophisticated means. These changes, if accepted, would raise his offense level to **26**.

---

[7]     As the PSR correctly notes (PSR ¶ 9), another $50,000 should be added to Crum's loss total, based on his commission of the additional act of fraud detailed in his information and plea agreement. This additional $50,000, however, has no effect on Crum's offense level because his aggregate loss amount remains well below $1,000,000.

• As for CRUM, the PSR concludes that his net offense level is 18. The government does not propose any changes to this calculation. It thus remains **18**.

IV.   **DEFENDANT-SPECIFIC OBJECTIONS.**

A.   <u>Upward Departure For Insufficiency Of Criminal History</u>.

Finally, with respect to defendant CRANDELL only, the Court should impose an upward departure because CRANDELL's criminal history category, Category I, "substantially under-represents the seriousness of [his] criminal history." U.S.S.G. § 4A1.3. Specifically, the Court should calculate CRANDELL's sentencing range as if he fell within Category II.

The reason for this request is that, at the time CRANDELL committed the instant offense, he had recently been arrested on separate fraud charges in Idaho and was in the process of pleading guilty to those charges. As the PSR notes, between 1999 and 2001, CRANDELL engaged in a real estate-related fraud scheme in Idaho that resulted in over $110,000 in losses to his employer. *Id.* ¶ 31. Following an investigation by local authorities, CRANDELL was arrested in January 2004 and charged with embezzlement and conspiracy to commit grand theft. *Id.* Finally, in January 2006, CRANDELL pleaded guilty to embezzlement. *Id.* He received a sentence of 3-11 years' imprisonment, but the court suspended the sentence and imposed a four-year term of probation. *Id.*

This is exceedingly brazen behavior. Indeed, at the time CRANDELL chose to participate in *this* multi-million dollar mortgage fraud scheme, he was under the cloud of felony charges arising from a *separate* fraud scheme in Idaho. Nevertheless, due to the vagaries of how the Guidelines calculate criminal history points, CRANDELL received only one point for the Idaho conviction because his 11-year sentence for that crime was suspended. *See* U.S.S.G. § 4A1.1(c). Furthermore, CRANDELL avoided the imposition *any* criminal history points under U.S.S.G. § 4A1.1(d), which authorizes a two-point increase "if the defendant committed the instant offense while under . . . probation," because the final

fraudulent loan in this case closed on November 30, 2005, and CRANDELL's term of probation in Idaho did not technically begin until January 2006 (even though CRANDELL had been arrested on the Idaho charges in 2004 and was resolving those charges at the time of the Arizona fraud). Thus, the PSR awards CRANDELL only one criminal history point, which leaves him in Category I—the same category applicable to defendants with pristine records who have never committed another crime.

The Guidelines specifically contemplate an upward adjustment under these circumstances. Indeed, under section 4A1.3(a)(2)(D), one enumerated basis for granting an upward criminal-history departure is if "the defendant was pending trial or sentencing on another charge at the time of the instant offense." *Id.*[8] Here, CRANDELL was awaiting sentencing on the Idaho embezzlement charge at the time he committed the Arizona crime, so the departure is warranted.

In sum, the Court should treat CRANDELL as if he committed the instant crime while on probation. This would result in the addition of two criminal history points, which would increase CRANDELL's total criminal history score to three and thus place him in Category II. *Cf. United States v. Wallace*, 573 F.3d 82, 95-96 (1st Cir. 2009) (affirming upward departure under section 4A1.3 where defendant committed new crime after being arrested for, but before sentencing on, a prior crime: "[T]he timing of the commission of the robbery at a time when 'one would expect a careful abidance to the law . . . demonstrated his propensity for criminal behavior.'"); *United States v. Gayou*, 901 F.2d 746, 748 (9th Cir. 1990) (affirming upward departure, based on inadequacy of criminal history category, because the defendant "was pending trial and sentencing in several forums when he was sentenced in this case").

---

[8]   *See also* U.S.S.G. § 4A1.3, note 2(A)(iv) ("An upward departure from the defendant's criminal history category may be warranted based on . . . [c]ommission of the instant offense while on bail or pretrial release for another serious offense.").

Respectfully submitted this 8th day of March, 2010.

DENNIS K. BURKE
United States Attorney
District of Arizona

*/s/ Dominic Lanza*
DOMINIC LANZA
RAYMOND K. WOO
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:  Tyrone Mitchell; Greg Clark; Brian Strong; Fred Petti; Mark Berardoni.