**TYRONE MITCHELL, P.C.**
Tyrone Mitchell, Esq., No. 016267
2633 E. Indian School Road, Suite 320
Phoenix, Arizona 85016
Office:  (602) 956-8200
Facsimile: (602) 956-8201
*Attorneys for Defendant*


# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA


| | |
|---|---|
| United States of America, | ) **CR-08-00255-PHX-GMS** |
| | ) |
| Plaintiff, | ) |
| | ) **DEFENDANT JEFFREY** |
| | ) **CRANDELL'S OBJECTIONS** |
| vs. | ) **TO PRESENTENCE** |
| | ) **REPORT AND SENTENCING** |
| | ) **MEMORANDUM** |
| Jeffrey Crandell, | ) |
| | ) (Assigned to the Honorable G. |
| | ) Murray Snow) |
| Defendant. | ) |

_____

___

Defendant Jeffrey Crandell, by and through counsel undersigned, hereby

submits this memorandum prior to his sentencing.  Defense counsel has

reviewed the Presentence Report ("PSR") with Mr. Crandell, and Defendant has

1

substantive objections to the Presentence Report.  In particular, Defendant objections to the probation department's failure to recommend a downward departure from the guideline range based upon the victim's conduct and responsibility with respect to the instant offense.  In addition, Defendant objects to the probation department's estimation of total loss, which fails to take into consideration Academy Mortgage's buy-back amounts as a set-off to the total loss calculation.  Finally, Defendant objects to the Government's memorandum which asks for various unwarranted upward departures.  However, Defendant will address the Government's memorandum in a separate response memorandum.

Ultimately, based upon the statutory sentencing factors set forth in 18 U.S.C. § 3553(a), Defendant Jeffrey Crandell respectfully requests a reasonable sentence below the applicable guideline range, which takes into consideration Defendant's good character, strong work ethic, service to his community, minor criminal history, and clear potential for rehabilitation.

I.    **FACTS**

Jeffrey Crandell is charged by Indictment with *(Count 1)* Conspiracy to Commit Bank Fraud*; (Counts 2 through 18)* Bank Fraud; and *(Counts 19 through 35)* transactional money laundering.  The aforementioned charges include aiding

and abetting, and forfeiture allegations.  There are five co-defendants in this case.

On November 9, 2009, Defendant Jeffrey Crandell pled guilty to Counts 4, 6, 7, 9, 10, and 11, Bank Fraud, in violation of 18 U.S.C. §1344.

The parties have entered into a plea agreement.  However, there are no agreements regarding sentencing.  The factual basis of the plea agreement alleges that between September and November of 2005, Defendant Jeffrey Crandell acted as the mortgage broker in several transactions involving real estate located in Queen Creek, Arizona.  The properties are identified as Lots A-1, A-2, A-3, A-4, B-2, and B-4.  The factual basis further alleges that the buyers were Tye Van Haren, Joshua Frazier, Phillip Rogers, and Shawn & Tye Van Haren.  With respect to each of these properties, the mortgage application stated that the buyer would be making the down payment.  Mr. Crandell helped prepare the loan applications, which were then sent to M&I Bank, a federally insure bank. However, Mr. Crandell knew that the statement alleging that the buyer would make the down payment was false.  To be sure, Jeffrey Crandell supplied the down payment on behalf of the buyer.

In the instant case, Defendant Jeffrey Crandell has a minor criminal history. In particular, Defendant has one prior felony conviction for grand theft by embezzlement.  Defendant received a suspended sentence and was placed on

3

probation.  On January 29, 2010, Mr. Crandell's probation was terminated, and Defendant paid his restitution in full. Defendant's criminal history points total one, establishing a Criminal History Category I.

In the instant case, Defendant's guideline range is 37 to 46 months, based on a Total Offense Level 21 and Criminal History Category I.

Defendant's sentencing hearing will be held before the Honorable G. Murray Snow on March 22, 2010.  Defendant Jeffrey Crandell hereby submits the following Objections to Presentence Investigation Report and Sentencing Memorandum, and respectfully requests that this Court impose a reasonable sentence below the applicable guideline range.

II.    **LAW AND ARGUMENT**

***18 U.S.C. §3553(a) Supports a Sentence Below the Guideline Range***

In determining a reasonable sentence, the District Court is **required** to consider certain factors pursuant to 18 U.S.C. §3553(a), including but not limited to: the "nature and circumstances of the offense" *(18 U.S.C. §3553(a)(1))*; "the history and characteristics of the defendant" *(18 U.S.C. §3553(a)(1))*; the kinds of sentences available *(18 U.S.C. §3553(a)(3))*; the need to avoid unwarranted disparities between similarly situated defendants *(18 U.S.C. §3553(a)(6))*;

applicable Guideline factors and policy statements *(18 U.S.C. §3553(a)(4) and (5))*; and the need to provide restitution to any of its victims *(18 U.S.C. §3553(a)(7))*.

While the Guidelines were designed to embody the §3553(a) considerations, judges in their discretion may differ on their approach as to how best reconcile "the disparate ends of punishment." ***Rita v. United States***, 551 U.S. 338, 127 S.Ct 2456, 2457-58 (2007)  Thus, the sentencing court is free to disagree with the Sentencing Guidelines, which should not be accorded greater weight than any of the other 18 U.S.C. § 3553(a) considerations.  ***United States v. Zavala***, 443 F.3d 1165, 1170-1171 (9th Cir. 2006).

In ***Gall v. United States***, 552 U.S. 38, 128 S.Ct. 586 (2007), the United States Supreme Court rejected a requirement for finding extraordinary circumstances in the case of a departure, and concluded that Court of Appeals must review all sentences, whether inside or outside of the guideline range, under a deferential abuse of discretion standard.  The Supreme Court further held that district courts should consider all of 18 U.S.C. §3553(a)'s factors in determining an appropriate sentence.  The court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented."***Id***. at 590.

"In reviewing the reasonableness of a sentence outside the Guideline range, appellate courts may therefore take the degree of variance into account and consider the extent of a deviation from the Guidelines.  We reject, however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guideline range.  We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 594-595.

Pursuant to the sentencing factors set forth in 18 U.S.C. §3553(a), Defendant Jeffrey Crandell respectfully requests that this Court accept the plea agreement, and impose a reasonable below the applicable guideline range. Defendant's good character, family values, strong work ethic, service to his community, minor criminal history, and clear potential for rehabilitation, support that a sentence *below* the guideline range will provide adequate deterrence, promote respect for the law, and constitutes an adequate disposition to address the seriousness of the offense. In this case, Defendant Jeffrey Crandell is 32 years old and has a minor criminal history characterized by one prior felony conviction for grand theft by embezzlement.  Defendant received a suspended sentence, and successfully completed a four-year probation sentence on January 29, 2010.   In fact, Mr. Crandell paid full restitution for this offense.  Defendant

6

received one criminal history point for this conviction.  Accordingly, Defendant's criminal history points total 1, establishing a Criminal History Category I.

 Jeffrey Crandell has a strong work ethic and impressive employment history.  Defendant worked as a salesman and general manager for different companies from 1998 through 2001.  Thereafter, from 2001 through November of 2005, Defendant was employed by Academy Mortgage under Northstar Financial as a loan officer.  In addition, Mr. Crandell operated his own business, Desert View Construction, in Gilbert Arizona.  However, Defendant terminated this business when the economy slowed and he was unable to make enough income to support his family.

To be sure, while Defendant has a history of being a hardworking and successful businessman, Jeffrey Crandell understands the serious nature of the present offense and is remorseful for his conduct.  Defendant also worked with Academy Mortgage to buy back the parcels of land for which he prepared the loan application in question, and therefore, has worked very hard to make amends for his actions.  In fact, for each of these parcels, Academy Mortgage repurchased the plots for purchase prices which exceeded the original loan amounts, therein negating any net loss to M&I Bank.

In addition, Defendant has made various positive changes in his professional life in order to prevent any future illegal activity.  Since September of

2009, Jeffrey Crandell has been employed by Infuse Soft, a software company in Arizona.  Mr. Crandell works on a sales team, assisting small businesses in using the company's software.  Jeff has proven himself to be one of the hardest workers at this company, and is now a team leader.  He is well liked and respected by his co-workers, and Defendant hopes to continue this work in the future.  . *(See Character letters submitted on behalf of Defendant Jeffrey Crandell)*

Jeffrey Crandell is a prime example of a person with good character and strong family values who displays clear potential for rehabilitation if given the chance.  To be sure, Mr. Crandell maintains a close relationship with his parents and four siblings, who continue to reside in Mesa, Arizona.  In addition, Defendant has been married to Tanya Young for approximately 15 years, and they have four children together: Carson (11); Ryland (9); Briteny (7); and Emma (2).  Jeff and Tanya are expecting their fifth child this year.   Mr. Crandell loves his family and is very devoted to his wife and children.  According to Karen Crandell, mother of Jeffrey Crandell, Defendant is a family man who is very actively involved in his children's life.  For example, he plays games with them, cooks, coaches his sons' football teams, organizes family evenings together, and helps to foster his children's participating in their faith and church activities. *(See*

*Character letter submitted by Karen Crandell on behalf of Defendant Jeffrey Crandell)*

Mr. Crandell also helps to care for his disabled father and assists his mother with her household chores whenever he is able.  Mr. Crandell's family and friends describe him as a kind and forgiving person who is an asset to the community.  Defendant's wife Karen describes Jeff as a good father who always puts his children first.   Karen has observed that as a result of the instant offense, Mr. Crandell has become a better person and learned from his mistakes.  In fact, Jeff has turned a bad situation into a positive growth experiences, and has rearranged his priorities to reflect that which is most important to him: family and church.  Jeff has also become more active in his church and has devoted much of his time to serving his church community. *(See Character letters submitted by Karen Crandell and Tanya Crandell on behalf of Defendant Jeffrey Crandell)*

In addition, Defendant Jeffrey Crandell is very active in his own faith and gives back to the community.  For example, Jeff serves in the Elder's Quorum Presidency, whereby he helps many inactive people in his community come back to their church.   As a First Counselor in the Elder's Quorum Presidency, Jeff spent a great deal of time counseling other church members and sharing his personal struggles in order to guide others.  D. Spencer Bennion, serving as bishop for his church, describes Mr. Crandell as a man of integrity and honesty.

The bishop expresses that Defendant stands out as one of the first to step forward and give his time and resources to help others in need, and is a trusted and valuable member of his community.  Ultimately, the aforementioned examples evidence that Defendant continues to serve selflessly in his church community, which emulates his good character and positive contribution to society. *(See Character letters submitted on behalf of Defendant Jeffrey Crandell)*

Based upon the statutory sentencing factors set forth in 18 U.S.C. §3553(a), including but not limited to Defendant's good character, strong work ethic, service to his community, minor criminal history, and clear potential for rehabilitation, this Court should impose a reasonable sentence below the guideline range, which will provide just punishment commensurate with the offense conduct, promote respect for the law, and allow adequate deterrence from future criminal activity.

III.   **OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT**
       **A.    *Victim's Responsibility and Conduct***

Defendant objects to the Presentence Report on grounds that the probation department should have assessed Defendant a downward departure from the guideline range based upon the victim's role and conduct with respect to the instant offense.

10

U.S.S.G. §5K2.10 provides in pertinent part:

"If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense."

While §5K2.10 states that this provision is usually not relevant in the context of non-violent offenses, this guideline section specifically allows that there may be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense.

The instant case presents unique and unusual circumstances whereby the victim, M&I Bank, knew and/or had constructive knowledge that the relevant mortgage applications were fraught with "red flags", but nevertheless, M&I Bank participated in the offense conduct by accepting the loans because they were making huge profits from the volume of applications.  In other words, M&I Bank has unclean hands, as the bank perpetuated, actively participated, and promoted the resulting fraud.

When examining the mortgage applications on their face, there were clear warning signs or red flags which the victim purposefully ignored.  To be sure, M&I Bank, which had access to pertinent information concerning the residential lots in question, knew that the applicants did not qualify for the loans in question.  While Mr. Crandell was supplying the down payments, M&I had access to all relevant

11

information which would put any bank on notice that there was suspect information on the applications, and that the particular applicants could not qualify for the loans.  Nevertheless, M&I participated in this activity by overlooking the obvious "red flags" suggesting that the bank should not approve these loan applications.

Given the aforementioned facts, the crucial question remains which the probation department failed to address:  Why would the alleged victim, M& I Bank, process and approve the applications, therein "overlooking" the overt problems on the applications, despite having constructive knowledge that there was false information on the applications, and that the respective applicants should not qualify for the loans in question?  The obvious answer is that M&I Bank was expecting to attain huge profits through the volume of loans processed.

For example, the bank was processing short term loans at a 7% interest rate, and making approximately $6,000 per loan.  In addition, many of the applicants would then apply for a second construction loan and/or a long-term mortgage loan, which would net M&I Bank a huge profit for just the applications, in addition to the interest the bank was earning on each loan.  In fact, the applicant for Lot A-2, Josh Frazier, a manager for Arizona Respiratory and Pharmacy, applied for an initial loan amounting to $340,000, while his income as listed on the Residential Loan Application was less than $25,000.  *(See excerpts*

*of mortgage and lender documentation for Josh Frazier's Uniform Residential Loan Application Lot B-2, attached hereto as Exhibit A)*

Thereafter, Mr. Frazier applied for a second loan on another property, Lot A-2 for $356,000 ***less than one week*** subsequent to his first loan application for $340,000.  In addition, on the application for Lot A-2, Mr. Frazier's net worth was documented as $8,409, after consideration of his assets and liabilities, and his income was less than $25,000.  However, in actuality, Mr. Frazier's net worth was closer to -$332,000, as *Mr. Frazier's first loan for $340,000* was pending and thus not listed as a liability in the second application.  Nevertheless, M&I Bank clearly knew about both loans and accepted the application despite the fact that Mr. Frazier should not have qualified for either loan.

Ultimately, M&I Bank purposefully overlooked the obvious "red flags" despite knowledge that Mr. Frazier could not support a second loan for $356,000, and approved the second application.   In fact, all of these loans in question were processed through the same M&I Bank employee, Carol Nemeth.  Therefore, when hundreds of thousands of loans were being processed, M&I Bank was willing to overlook the obvious "red flags" on the applications because they expected to receive big profits in the future. *(See mortgage and lender*

13

*documentation for Josh Frazier's Uniform Residential Loan Application Lot A-2, attached hereto as Exhibit B)*[1]

As another example, applicant Phillip Rogers, who was a plumber by trade, submitted a Uniform Residential Loan Application for a loan amounting to approximately $348,749.00.  The mortgage application showed that this plumber had his job for approximately 3 years, and that he already had another home and was therefore paying on an additional note.  Mr. Rogers' application is but another illustration of the voluminous Uniform Residential Loan Applications which M&I accepted despite knowledge as to the "red flags".  The Uniform Residential Loan Application represented that the parcels of land in question were to be the applicants' primary residence.  However, it was obvious that substantive information on the application was inaccurate, such as the fact that the applicants already had primary residences, as well as the fact that their respective salaries and assets could not support the loans requested.

Therefore, the victim in this case, M&I Bank, had unclean hands with respect to the offense conduct, as the bank had constructive knowledge of the obvious problems which appeared on the face of the applications, yet knowingly ignored the "red flags" in order to receive large profits.  Therefore, the victim substantially contributed to the instant offense, because the defendants could not commit bank fraud without the participation of M&I Bank.  Given the bank's

---

[1] M&I Bank received this information prior to approving the loan applications.

conduct, M& I was not merely complicit in the instant offense.  Rather, they were active participants and promoted the resulting fraud.  Therefore, Defendant Jeffrey Crandell should receive a downward departure from the guideline range pursuant to U.S.S.G. §5K2.10

### B.    Evaluation of Loss

The probation department has incorrectly alleged in the Presentence Investigation Report that the "total actual loss" in this case amounts to $1,687,381. The probation department alleges that this number represents the difference between the initial total loan amounts and the amount subsequently recovered through the sale of various properties through foreclosure.  The probation department's calculations are incorrect on several fronts.  First, the probation department uses all 18 properties in formulating its calculations, rather than the six properties of which Defendant Jeffrey Crandell participated in the loan applications as admitted to in the factual basis of the plea agreement. Second, the probation department failed to subtract the buy-back amounts which were paid back by Academy Mortgage in calculating the "total actual loss".

### 1. "Loss" Enhancement Under U.S.S.G. §2B1.1

Under U.S.S.G. §2B1.1(b), the general rule is that the court should apply the greater of the actual or intended loss.  See U.S.S.G. §2B1.1 cmt. n.3(A).  In the instant case, the "actual loss" is the appropriate measure for calculating the loss enhancement, because although Mr. Crandell and the other co-defendants misrepresented that the down payments for the mortgages were coming from the applicants, i.e. the "straw" buyers, there is no evidence that Mr. Crandell intended for the bank to risk losing the amount of the loan proceeds.  In fact, once the buyers defaulted on their loans, and the properties were at risk of foreclosure, Defendant Jeffrey Crandell facilitated the repurchase of these lots from M&I in order to minimize any loss to the M&I Bank.

In calculating loss, the district court need only make a reasonable estimate of the loss based on the available information and appropriate factors, which is intended to reflect a reasonable approximation of the amount of money the lenders will actually lose as a result of Defendant's conduct.  ***United States v. Haddock***, 12 F.3d 950, 961 (10th Cir. 1993).  "The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.  For this reason, the court's determination is entitled to appropriate deference."  *U.S.S.G. §2B1.1, Application Note 3(C)*.  In addition, only the net loss should be considered.  Anything received from the defendant reduces the actual loss.   Actual loss should not include amounts that the bank easily recovers

16

by foreclosure, setoff, immediate recovery from the debtor, or other legal remedies.  *United States v. Wright*, 60 F.3d 240, 242 (6th Cir. 1995).

The Guidelines "do not present a single universal method for loss calculation under §2B1.1 – nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Crandall*, 525 F.3d 907, 912 (9th Cir. 2008), quoting *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  Therefore, U.S.S.G. §2B1.1 is not to be applied mechanically.  Rather, district courts should "take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss."  *United States v. Stoddard*, 150 F.3d 1140, 1145-46 (9th Cir. 1998), quoting *United States v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996).

2.  **Mr. Crandell is Responsible for his Mortgage Loan Applications, But the "Relevant Conduct" Cannot Include Co-Defendant's Activities in Calculating the Loss Amount**

In the instant case, Defendant objects to the probation department's calculation as to the actual loss caused by Jeffrey Crandell.  While the probation department estimates that the Total Actual Loss is $1,687, 381, Defendant disagrees with this calculation for the following reasons.

First, there was no massive conspiracy to commit bank fraud between Defendant Jeffrey Crandell and the various co-defendants.  Nevertheless, the probation department included in its calculations alleged losses from properties which were not caused or contributed to by Defendant Jeffrey Crandell.  While the probation department assumes that Defendant was involved in a sophisticated conspiracy with the other co-defendants, the reality of the offense was that the co-defendants were separate mortgage brokers who worked on individual loans while working for Academy Mortgage.  As evidence of this fact, the Government originally had charged the appraiser Kurt Holm with allegations that he conspired with the co-defendants to inflate the relevant land values.  However, prior to trial of this action, the Government dismissed all counts against the appraiser, and therefore, there is no evidence that there was a conspiracy amongst the different co-defendants and appraiser to defraud the bank or to inflate land values.  Rather, the co-defendants were engaged in individualized conduct with respect to their mortgage broker activities.

To be sure, the properties which should be used in this calculation are the properties specified in the factual basis of the plea agreement: Lots A-1, A-2, A-3, A-4, B-2, and B-4.  Defendant Jeffrey Crandell conceded that he helped to prepare each of these loan applications, and supplied the down-payments on behalf of the buyers.

18

While Defendant prepared the loan application for these six properties, the probation department has included 12 additional lots in calculating the loss, for which Defendant did not prepare the loan applications.   To be sure, Defendant Jeffrey Crandell did not have knowledge as to all the loan applications prepared by his co-workers, nor did he conspire with the other co-defendants to defraud M&I Bank on the loan applications they prepared.  Therefore, the proper calculation of actual loss for purposes of applying a sentencing enhancement under §2B1.1 should be determined by evaluating the loss with respect to the six individual lots for which Defendant prepared the loan applications.

Second, the probation department failed to determine the net loss, as anything received from the defendant reduces the actual loss.   Actual loss should not include amounts that the bank easily recovers by foreclosure, setoff, immediate recovery from the debtor, or other legal remedies.

In the instant case, Academy Mortgage repurchased the six lots in question from M&I Bank prior to the fraudulent activity being discovered by the Government and prior to any charges being filed.  In particular, when the "straw" buyers began to default on the loans, M&I Bank contacted Academy Mortgage, and as a result of negotiations facilitated by Defendant Jeffrey Crandell and Academy Mortgage, Academy Mortgage bought back these properties from the bank.  Therefore, the net loss is quite different from the loss calculations used by

the probation department, which failed to consider the buy-back amounts received by M&I Bank.   Defendant submits that the following loss calculations are most accurate and should be used by this Court in determining the correct estimation of actual loss in this case:[2]

|  | Loan Amount  - | Buy-Back Amount = | Total Actual Loss |
|---|---|---|---|
| Lot A-1 | $311, 500 | $337,878.72 | $ No loss |
| Lot A-2 | $356,000 | $370,820.04 | $ No loss |
| Lot A-3 | $348,749 | $361,926.56 | $ No loss |
| Lot A-4 | $400, 800 | $413,897.61 | $No loss |
| Lot B-2 | $340,000 | $353,313.03 | $ No loss |
| Lot B-4 | 356,000 | | $ No loss[3] |

Based on the foregoing calculations, it appears that M&I Bank did not suffer any net loss as a result of the loan applications prepared by Mr. Crandell. Therefore, the 16-level sentencing enhancement under U.S.S.G. §2B1.1 is clearly inflated and does not fairly represent the total actual loss in this case.

---

[2] The "buy-back" information was received by the Government from Academy Mortgage.
[3]  Defendant did not receive the "buy-back" amount for this loan, but has reason to believe that Academy Mortgage also repurchased this lot and M&I suffered no loss.

### 3.    Value of the Land Should Be Considered as a Set-Off to the Total Actual Loss

Finally, even if this Court is inclined to charge Defendant Jeffrey Crandell with the loss associated with all 18 parcels of land listed in the Presentence Report despite the fact that Defendant did not actively participate in these transactions and/or conspire to prepare 12 of these loan applications, this Court should consider the value of the parcels of land as an offset to the loss suffered.  For instance, this case is unique as compared to securities fraud and other fraudulent investment activities where the victims end up with no money after having invested their entire life's savings with a defendant.  To the contrary, in the instant case, M&I Bank, the alleged victim in this case, received real property assets when the borrowers started to default on their loans.  That is, the bank now owned the real property, which is a valuable asset.

Given this scenario, if this Court will not use the buy-back amounts as a set off to the total loss suffered by M&I Bank, this Court should consider the value of the properties at the time of the fraud as a set off to the total loss.  The value of these parcels at the time of the defaults and repurchases by Academy Mortgage averaged about $300,000 per parcel of land.[4]  In addition, as a result of the bank

---

[4]  Any discussion with respect to the parcel's current market value is irrelevant with respect to estimating

fraud, and default by the "straw" buyers, M&I Bank had title to these parcels, which had a fair market value associated with the land.   Moreover, as discussed previously, Academy Mortgage bought back each of the parcels for which Mr. Crandell had prepared the loans, and the purchase price for these parcels exceeded the original loan amounts.   Accordingly, this Court should consider the relevant value of the property, in addition to the repurchasing of the lots, in evaluating a reasonable estimate of total loss in this case.   Based on such assessments, Defendant submits that the actual loss does not justify a 16 level sentencing enhancement.


**IV.     CONCLUSION**

Based on the foregoing, Defendant Jeffrey Crandell respectfully requests that this Court impose a reasonable sentence below the applicable guideline range.

DATED this 15th day of March, 2010.


/s/ Tyrone Mitchell
Tyrone Mitchell, Esq.
*Attorney for Defendant*

---

loss.  Rather, the market value, if considered, should be valued as of the date of the fraud.

CERTIFICATE OF SERVICE

I certify that on the 15th day of March, 2010, I electronically transmitted this document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants.

Kevin Rapp
Dominic Lanza
Raymond Woo
Assistant U.S. Attorneys
Two Renaissance Square
40 North Central Avenue
Suite 1200
Phoenix, Arizona 85004-4408


                                        /s/ Tyrone Mitchell
____
TYRONE MITCHELL
*Attorneys for Defendant*

23