DENNIS K. BURKE
United States Attorney
District of Arizona

Raymond K. Woo
Arizona State Bar No. 023050
raymond.woo@usdoj.gov
Dominic Lanza
California State Bar No. 225989
dominic.lanza@usdoj.gov
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>1. Jeffrey Crandell,<br>2. Jake Whitman,<br>4. Erin Leastman, and<br>5. Fredric Crum.<br><br>　　　　　　Defendants. | CR-08-0255-PHX-GMS<br><br>**GOVERNMENT'S RESTITUTION MEMORANDUM** |

## INTRODUCTION

The United States of America, through undersigned counsel, respectfully submits the following restitution memorandum for the Court's consideration. For the reasons set forth below, the government requests that the Court award restitution to M&I Bank ($1,364,532.19), Academy Mortgage ($997,835.96), John Lundin ($42,472.82), and Melanie Morris ($29,554), and that the Court hold each defendant jointly and severally liable for the losses associated with each transaction in which he or she participated.

///

///

**LEGAL STANDARD**

Federal law requires criminal defendants in certain cases, including cases (such as this case) involving property offenses under Title 18 committed by fraud or deceit, to pay restitution to the "victims of the offense." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). At bottom, the restitution analysis involves three inquiries: (1) determining who qualifies as a "victim"; (2) identifying the amount of each qualifying victim's "loss"; and (3) apportioning responsibility for paying restitution between the defendants.

A.   "Victim."

As for the first inquiry, the term "victim" is defined by statute to mean "a person directly and proximately harmed as a result of the commission of [the] offense." 18 U.S.C. § 3663A(a)(2). *See also United States v. Andrews*, __ F.3d __, 2010 WL 1338138, * 2 (9th Cir. Apr. 7, 2010) ("'A victim for restitution purposes is a person who has suffered a loss caused by the specific conduct that is the basis of the offense of conviction.'") (citation omitted). By adopting this formulation, Congress sought to "construe[] the term 'victim' broadly." *United States v. Jackson*, 982 F.2d 1279, 1283 (9th Cir. 1992). The burden of proof rests on the government to show that a particular person or entity qualifies as a victim. *United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008).

B.   Loss Amount.

As for the second inquiry, Congress has specified that each victim is entitled to restitution "in the *full amount* of each victim's losses . . . without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A) (emphasis added). Although the government bears the burden of demonstrating the applicable loss amount by a preponderance of the evidence, *id.* § 3664(e),[1] the Ninth Circuit has emphasized that "'the primary and overarching goal [of the restitution statute] is to make victims of crime *whole*, to *fully*

---

[1] It should be noted that the loss analysis for restitution purposes is different than the loss analysis the Court previously conducted under U.S.S.G. § 2B1.1(b) when calculating each defendant's offense level. *United States v. Catherine*, 55 F.3d 1462, 1464 (9th Cir. 1995) ("Although . . . the guidelines . . . and 18 U.S.C. § 3663, governing restitution, both involve a calculation of loss to the victim, the method of calculating loss is different in each.").

2

compensate . . . victims for their losses and to restore . . . victims to their original state of well-being.'" *United States v. Gordon*, 393 F.3d 1044, 1053 (9th Cir. 2004) (citation omitted) (emphasis added by Ninth Circuit). Thus, district courts are granted a "degree of flexibility" in calculating restitution losses. *Id. See also Andrews*, 2010 WL 1338138 at * 2 (same). Notably, victim-impact statements and affidavits are generally sufficient to satisfy the government's burden of proof. *Waknine*, 543 F.3d at 557 ("[V]ictim affidavits will generally provide sufficient, reliable evidence to support a restitution order.").

C.      Apportioning Liability.

As for the third inquiry, Congress has specified that "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and the economic circumstances of each defendant." 18 U.S.C. § 3664(h). As one court has explained, this provision "explicitly gives a district court discretion as to whether joint and several liability should apply or whether liability should be apportioned among the defendants based on their economic circumstances and their respective contributions to the victim's losses." *United States v. Squirrel*, 588 F.3d 207, 212 (4th Cir. 2009).

Finally, it bears emphasizing that, because each defendant pleaded guilty to an offense that has a "conspiracy" or "scheme" element, the Court may hold each defendant liable for the losses associated with *all* of the fraudulent transactions in which he or she participated. *See* 18 U.S.C. § 3663A(a)(2); *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir. 1999) ("'[R]estitution may be ordered for losses to persons harmed in the course of the defendant's scheme even beyond the counts of conviction' . . . . [W]hen the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense . . . the restitution order [may] include acts of related conduct for which the defendant was not convicted.") (citation omitted); *United States v. Lam Thanh Pham*, 2008 WL 4394755, *2 (9th Cir. Sept. 23, 2008) ("Because Pham admitted in his plea agreement to participating in a 'scheme and artifice'

3

to commit bank fraud, notwithstanding the fact that the one count to which he pled guilty only involved approximately $4,500 in loss, the district court did not abuse its discretion in imposing a $1 million restitution obligation on him when the full amount of loss resulting from the scheme in which Pham admitted being involved exceeded $1.6 million.").[2]

## ANALYSIS

A.  <u>The Qualifying "Victims" Are M&I Bank, Academy Mortgage, John Lundin, and Melanie Morris</u>.

The Court should find that four individuals and entities qualify as "victims" entitled to restitution in this case: M&I Bank, Academy Mortgage, John Lundin, and Melanie Morris.[3]

First, the Court should find that M&I Bank qualifies as a victim. As shown at sentencing, the defendants used lies to dupe M&I Bank into providing more than $6 million in mortgage financing. These lies were contained in the mortgage applications that CRANDELL, WHITMAN, and CRUM prepared and submitted on behalf of borrowers. Among other things, these defendants lied about the borrowers' income, assets, source of down payment, and intent to use the properties as a primary residence. Furthermore, at closing, LEASTMAN continued the deception by falsely certifying to M&I Bank that the borrowers had made the down payment. After the unqualified borrowers inevitably defaulted, M&I Bank was left holding undeveloped dirt lots that were worth a small fraction of the outstanding loan balances. M&I Bank easily

---

[2] As the Court may recall, the overall scheme involved three different sub-deals: Chandler Heights (three properties), Queen Creek (seven properties), and Gilbert (seven properties). At sentencing, the Court included all 17 of these properties in LEASTMAN's loss calculations; included all of the Chandler Heights and Gilbert properties (but not the Queen Creek properties) in WHITMAN's loss calculations; included all of the Chandler Heights and Queen Creek properties (but not the Gilbert properties) in CRANDELL's loss calculations; and included three discrete properties (Lot 3, Parcel A in Chandler Heights and Lot 3, Parcel A and Lot 5, Parcel B in Gilbert) in CRUM's loss calculations.

[3] In addition to receiving victim-impact statements from the four victims identified above, the United States also received a victim-impact statement from an individual named Greg Milan. The United States does not ask the Court to qualify Mr. Milan as a victim because, among other things, he did not purchase any of the 17 properties that were deemed part of the conspiracy at sentencing and he did not provide sufficient documentation to substantiate his loss claims.

4

qualifies as a "victim" entitled to restitution under these circumstances. *See, e.g., Catherine*, 55 F.3d at 1463-65 (in mortgage fraud case, lending institution qualifies as victim).

The Court also should find that Academy Mortage qualifies as a victim. As shown at sentencing (and as further detailed in the documents submitted in support of Academy Mortgage's victim-impact statement), Academy Mortgage was the mortgage brokerage that employed CRANDELL, WHITMAN, and CRUM. As a broker, Academy's role was to locate borrowers who might be interested in borrowing money from M&I Bank, to oversee preparation of borrowers' loan paperwork, and to collect a commission from M&I Bank for loans that were successfully brokered. Under its contract with M&I Bank, Academy was obligated to indemnify M&I Bank for any losses resulting from fraud committed by Academy's employees. That is exactly what occurred in this case—Academy ultimately bought back five of the non-performing Queen Creek loans after it became clear that CRANDELL had falsified the applications. Academy thus qualifies as a victim for restitution purposes, because it suffered losses that were directly and proximately caused by the defendants' fraudulent conduct.

Finally, the Court should find that two of the individual borrowers (John Lundin and Melanie Morris) also qualify as victims. Both have made specific requests for restitution, under the theory that they were fraudulently induced to acquire undeveloped lots at overvalued prices and suffered financial harm when the lots fell into foreclosure. Because these borrowers' losses were directly and proximately caused by the defendants' conduct, they qualify as victims. *Cf. United States v. Innarelli*, 524 F.3d 286, 288-89 (1st Cir. 2008) (awarding restitution, in an amount to be determined, to a group of "unwitting and typically unsophisticated" borrowers in a mortgage fraud case in which the defendant mortgage brokers had "generated documents falsely representing to lending institutions that the buyers had the financial wherewithal to afford mortgage loans" and the borrowers suffered losses when they "were predictably unable to pay their mortgage loans and defaulted").

B.     Victim-By-Victim Loss Analysis.

     1.     **M&I Bank**.

M&I Bank requests $1,834,314.95 in restitution, an amount it deems "conservative." As shown below, the government disagrees in part with M&I Bank's methodology and believes M&I Bank is likely entitled to no more than $1,364,552.19 due to statutory and Ninth Circuit-imposed limitations on calculating restitution losses.

Before addressing the specifics of M&I Bank's restitution request, however, it is important to acknowledge two significant omissions from that request. *First*, M&I does not seek restitution for 12 of the 17 loans at issue in this case (even though the Court found, at sentencing, that all 17 were procured by fraud). Specifically, M&I Bank does not seek any restitution for the five properties that were "bought back" by Academy Mortgage or for the seven properties that were refinanced via construction loans from other banks. The government agrees that M&I Bank is not entitled to restitution for these 12 properties because it did not suffer any "actual loss" with respect to them. *United States v. James*, 564 F.3d 1237, 1242 (10th Cir. 2009) (holding, in mortgage fraud case, that lending institution was not entitled to restitution for certain properties because it had not "retained the original mortgages and, therefore, did not suffer any actual loss"); *Catherine*, 55 F.3d at 1464 (although courts may consider alternative loss measurements (such as intended loss or gain) at sentencing, only "actual loss" may be considered when calculating restitution). *Second*, M&I Bank asserts that, in addition to procuring the 17 fraudulent loans at issue in this case, the defendants also procured several "additional fraudulent loans" that caused M&I Bank to suffer more than $1 million in additional losses. Nevertheless, M&I Bank does not assert any claim for restitution for those losses. Accordingly, the government agrees that the Court should not consider these other properties when calculating restitution.

As for the five properties that *are* included in M&I Bank's restitution request, M&I Bank contends in its victim-impact statement that its losses should be calculated by (1) identifying the outstanding loan balance at the time of foreclosure and then (2) offsetting that figure by the net

proceeds (*i.e.,* the sale amount minus costs and fees) it was able to recoup when it sold the underlying collateral to third parties:

| **Lot** | **Outstanding Balance[4]** | **Net Sale Proceeds** | **Loss** |
|---|---|---|---|
| 3-B/Chandler Heights | $467,397.72 | $82,870.30 | $384,527.42 |
| B-5/Queen Creek | $348,000.00 | $87,000.00 | $261,000.00 |
| 5-A/Gilbert | $424,569.93 | $28,693.73 | $395,876.20 |
| 5-B/Gilbert | $436,316.57 | $37,701.64 | $398,614.93 |
| 2-A/Gilbert | $421,242.49 | $26,946.09 | $394,296.40 |
| | | | **$1,834,314.95** |

The government agrees, in part, this is the correct methodology for calculating restitution losses. *Catherine*, 55 F.3d at 1465 ("[T]he amount of restitution to be paid . . . [is] the actual loss, which . . . must be calculated as the unpaid balance of the loan, minus the value of the collateral at the date the victim bank gained control of the collateral, plus the bank's expenses prior to the same date."); *United States v. Smith*, 944 F.2d 618, 624-25 (9th Cir. 1991) (same); *United States v. Boccagna*, 450 F.3d 107, 114 (2d Cir. 2006) (same).

M&I Bank's approach is flawed in part, however, because its "offset" figures are based on the amount it *actually recovered* when the underlying properties were sold to third-party buyers in 2008 and 2009. Yet under the restitution statute and Ninth Circuit law, the "offset" amount must be based on the value of the property at the instant M&I Bank gained control over

---

[4] For four of the five properties, M&I Bank has submitted documentation showing that the loan balance at foreclosure was greater than the initial loan amount, due to the inclusion of interest charges, late charges, valuation fees, and attorney fees. The government agrees that M&I Bank may obtain restitution for these additional items and is not limited to the outstanding principal balance. *See, e.g., United States v. Davoudi*, 172 F.3d 1130, 1136 (9th Cir. 1999) ("Because the contractual interest on a loan is not speculative and is the raise d'etre for the loan, the district court may also choose to include interest still due on the loan in the loss calculation for purposes of restitution."); *Catherine,* 55 F.3d at 1465 (victim-lender is entitled to restitution for, *inter alia*, "the bank's expenses prior to" foreclosure); *United States v. Smith*, 944 F.2d 618, 626 (9th Cir. 1991) ("Foregone interest is one aspect of the victim's actual loss, and thus may be part of the victim's compensation"); *United States v. Boccagna*, 450 F.3d 107, 121 (2d Cir. 2006) (victim-lender is entitled to restitution for the "various taxes and foreclosure expenses" associated with the underlying property).

it. *See* 18 U.S.C. § 3663A(b)(1)(B)(ii) (requiring offset by the value of property "as of the date the property is returned"); *United States v. Davoudi*, 172 F.3d 1130, 1134 (9th Cir. 1999) (holding that the restitution statute "requires property to be valued as of the date the victim took control of the property"); *Catherine*, 55 F.3d at 1465 ("The district court abused its discretion by valuing the collateral at the time of the final disposition of the property, rather than at the time the bank gained control of the property."); *Smith*, 944 F.2d at 625 ("Smith should receive credit against the restitution amount for the value of the collateral as of the date title to the property was transferred to [the lender]. . . . Any reduction in value after Smith lost title to the property stems from a decision by the new owners to hold on to the property . . . .").[5] Unfortunately, the materials submitted by M&I Bank in support of its victim-impact statement do not denote the specific date on which it obtained title to each underlying property or the value of each property on the acquisition date—the materials simply denote when the third-party sales were ultimately held and the amount recouped from those sales.[6]

After receiving M&I Bank's victim-impact statement, the government brought this issue to the bank's attention. M&I Bank has now responded by explaining that, in order to acquire title to the underlying properties during the foreclosure process, it was required to submit a "bid" to the foreclosure trustee. (Third-party buyers could have submitted competing bids during that process, but no such bids were apparently made.) In formulating its bids, M&I Bank sought to estimate the fair market value of the properties. It ultimately submitted bids on the following dates and in the following amounts:

---

[5] In this respect, the restitution statute is different from U.S.S.G. § 2B1.1, which governs loss calculations for sentencing purposes. *Davoudi*, 172 F.3d at 1134-35 (explaining that although loss offsets for *restitution* purposes must be based on the value of collateral at the moment of acquisition by the victim, loss offsets for *sentencing* purposes may be based on the value of collateral at the time of sentencing).

[6] Specifically, the materials submitted by M&I Bank indicate that (1) Lot 3, Parcel B in Chandler Heights was sold in March 2009; (2) Lot B-5 in Queen Creek was sold in June 2008; (3) Lot 5, Parcel A in Gilbert was sold in December 2009; (4) Lot 5, Parcel B in Gilbert was sold in September 2009; and (5) Lot 2, Parcel A in Gilbert was sold in November 2009.

8

(1) On June 15, 2007, submitted a bid of $313,628.54 for Lot 3, Parcel B in Chandler Heights;

(2) On November 20, 2008, submitted a bid of $130,811.77 for Lot 5, Parcel A in Gilbert;

(3) On April 15, 2009, submitted a bid of $76,672.90 for Lot 5, Parcel B in Gilbert; and

(4) On February 24, 2009, submitted a bid of $124,881.31 for Lot 2, Parcel A in Gilbert.

By contrast, M&I Bank did not acquire title to Lot B-5 in Queen Creek through the foreclosure process (and thus did not submit a bid for that property). Instead, it simply sold the overdue note to a third-party buyer for $87,000.[7]

The government believes that these "bid" figures (rather than the sale proceeds M&I Bank eventually obtained when it resold the properties to third-party buyers) most closely approximate the value of the collateral "as of the date the property [was] returned" to the bank. U.S.C. § 3663A(b)(1)(B)(ii). Thus, if the Court were to utilize each "bid" figure as the relevant offset amount, M&I Bank's losses would be recalculated as follows:

| **Lot** | **Outstanding Balance** | **"Bid"** | **Loss** |
|---|---|---|---|
| 3-B/Chandler Heights | $467,397.72 | $313,628.54 | $153,769.18 |
| B-5/Queen Creek | $348,000.00 | $87,000.00 | $261,000.00 |
| 5-A/Gilbert | $424,569.93 | $130,811.77 | $293,758.16 |
| 5-B/Gilbert | $436,316.57 | $76,672.90 | $359,643.67 |
| 2-A/Gilbert | $421,242.49 | $124,881.31 | $296,361.18 |
| | | | **$1,364,532.19** |

Although the government acknowledges that Ninth Circuit law most likely requires the Court to follow this approach, it must be noted that it seems unfair to preclude M&I Bank from obtaining full restitution for its losses under these circumstances. M&I Bank happened to obtain title to the properties during a time of unprecedented tumult and illiquidity in the Phoenix real

---

[7] An employee from M&I Bank will be available at the restitution hearing to lay foundation concerning the "bid" figures set forth above.

9

estate market, causing the value of the properties to plummet during the short interval between when M&I Bank obtained title and when M&I Bank was finally able to sell the properties to third parties. Deeming M&I Bank responsible for such losses seems contrary to Congress's view that "the restitution process . . . [should] be quick and reasonable" and that when "'the precise amount of [restitution] is difficult to determine . . . the court [may] reach an expeditious, reasonable determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim.'" *Gordon*, 393 F.3d at 1054 (citations omitted). Nevertheless, *Davoudi, Catherine*, and *Smith* appear to control the analysis and require the Court to offset M&I Bank's losses by the value of the properties at the moment of acquisition.

2.   **Academy Mortgage**.

Academy Mortgages requests $1,788,803 in restitution and notes that the "company barely survived" the defendants' fraudulent scheme. As shown below, the government disagrees in part with Academy's request and believes the Court should award restitution to Academy in the amount of $997,835.96.

Academy's restitution request is based on the five Queen Creek properties it "bought back" from M&I Bank pursuant to the indemnification clause in the parties' brokerage agreement. Academy has submitted documentation showing that it reacquired the properties in two different transactions:

First, in May 2007, Academy agreed to pay $337,878.72 for Lot A-1. Academy did not pay cash to M&I Bank to fund this purchase. Instead, Academy agreed to borrow $616,000 from M&I Bank and used a portion of these loan proceeds to pay for the underlying property. Second, also in May 2007, Academy agreed to pay $1,499,957.24 for lots B-2, A-2, A-3, and A-4 (*i.e.,* $374,989.31 per lot). At closing, Academy provided approximately $581,836 in cash from its own reserves, supplied an additional $278,121 in cash that was left over from the other transaction, and satisfied the remaining balance by taking out another loan ($640,000) from M&I Bank. In short, Academy Mortgage paid a total of $1,837,835.96 in May 2007 to buy back the five fraudulently-procured lots.

Academy further contends that, since obtaining title to the properties, it has paid approximately $150,967.56 in interest to M&I Bank (based on the two promissory notes it executed to fund the purchases). Finally, Academy contends that the current market value of each property is about $40,000. Thus, Academy claims that it is entitled to restitution of $1,788,803 (*i.e.,* the initial payment of $1.838 million, plus about $151,000 in interest costs, minus an offset of $200,000 for the current value of the underlying land).

There are two problems with Academy's request. First, the government does not believe Academy is legally entitled to restitution for the $151,000 in interest costs it has incurred since obtaining the properties in May 2007. As noted, the Ninth Circuit has held that victim-lenders are not entitled to restitution for any losses incurred after obtaining the title to collateral because such losses "stem[] from a decision by the new owners to hold on to the property." *Smith*, 944 F.2d at 625. The same logic would seem to apply here.

Second, Academy's offset approach shares the same temporal flaw as M&I Bank's, because Academy seeks to offset its losses by the current market value of the properties (*i.e.,* $40,000 each) rather than by their market value at the moment (May 2007) it obtained them.

The government brought this issue to Academy's attention after receiving Academy's victim-impact statement. In response, Academy has now supplied information showing that, as part of the buy-back process, the five Queen Creek lots were appraised in April 2007. The appraiser concluded the lots in Parcel A were worth $200,000 each and the lots in Parcel B were worth $190,000 each. These appraisal figures, however, were "subject to" the completion of several improvements such as street paving, construction of a perimeter wall, and the installation of sewers and other utilities. Academy believes the value of these improvements was about $30,000, meaning that the value of the lots in April 2007 in their actual, unimproved form was $170,000 (for Parcel A) and $160,000 (for Parcel B).[8]

---

[8] A representative from Academy will be available at the restitution hearing to discuss these issues.

11

For the reasons set forth in Part B.1 above, the government believes Ninth Circuit law requires the Court to revise Academy's restitution request by (1) rejecting Academy's request for $151,000 in restitution based on its interest/carrying costs and (2) using the April 2007 appraisal figures as the applicable "offset" values for the properties. If the Court were to do so, Academy would be entitled to restitution as follows:

| **Lot** | **Buy-Back Amount** | **Offset** | **Loss** |
| --- | --- | --- | --- |
| A-1/Queen Creek | $337,878.72 | $170,000 | $167,878.72 |
| A-2/Queen Creek | $374,989.31 | $170,000 | $204,989.31 |
| A-3/Queen Creek | $374,989.31 | $170,000 | $204,989.31 |
| A-4/Queen Creek | $374,989.31 | $170,000 | $204,989.31 |
| B-4/Queen Creek | $374,989.31 | $160,000 | $214,989.31 |
|  |  |  | **$997,835.96** |

3.  **John Lundin**.

John Lundin, who purchased two of the properties at issue (Lot 4, Parcel B in Chandler Heights and Lot B-5 in Queen Creek), seeks $42,472.82 in restitution. In support of this claim, Mr. Lundin has submitted documentation showing (1) he incurred $2,617 in fees during the bankruptcy process, which he was forced to go through after defaulting, (2) he borrowed approximately $15,617.55 from a home equity line to make the initial payments on the mortgages, which amount he still owes the bank, (3) he paid a total of $10,000 in earnest money as part of the closing process for the two mortgages, (4) he paid $9,854.06 to a contractor in an unsuccessful attempt to develop the properties, (5) he paid $884.21 in insurance premiums, and (6) he paid $3,500 for a site plan to develop the properties.

The government supports Mr. Lundin's request for restitution in the full amount he has requested: $42,472.82. (The government further submits that, for defendant-responsibility purposes, this total should be apportioned evenly (*i.e.,* $21,236.41) between Mr. Lundin's two properties.) At bottom, Mr. Lundin was lured into the scheme by lies and misrepresentations and then spent about $40,000 of his own money attempting to keep up with the mortgage payments

and otherwise developing the properties so they could be flipped for a profit. When he ran out of money, he spent another $2,600 during the bankruptcy process. All of these losses were "directly and proximately" related to the defendants' conduct, *see* 18 U.S.C. § 3663A(a)(2), so restitution is proper.

4. **Melanie Morris**.

Melanie Morris, who purchased Lot 5, Parcel A in the Gilbert development, seeks $29,554 in restitution. In support of this claim, Ms. Morris has submitted documentation showing (1) she made interest payments of $5,299.30 in 2007, (2) she made interest payments of $11,260.99 in 2008, (3) she incurred $20,018.25 in legal fees and costs stemming from foreclosure-related litigation, and (4) she incurred an additional $493.75 in additional foreclosure-related litigation fees from another law firm.

The government supports Mr. Morris's request for restitution in the full amount she has requested: $29,554.[9] Like Mr. Lundin, Ms. Morris was lured into the scheme by lies and misrepresentations, spent thousands of dollars of her own money trying to keep up with the payments, and then spent thousands more on foreclosure-related fees and expenses. All of these losses were "directly and proximately" related to the defendants' conduct, *see* 18 U.S.C. § 3663A(a)(2), so restitution is proper.

**C.   Equitable Distribution of Restitution Among the Defendants**

The government believes the fairest and most sensible approach for apportioning liability in this case is to hold each individual defendant jointly and severally liable for the losses associated with each fraudulent transaction in which he or she participated. Based on the loss calculations set forth in Part B above, coupled with the transaction-by-transaction responsibility determinations previously made by the Court at sentencing, the analysis is as follows:

---

[9] The interest payments and legal fees described in Mr. Morris's documentation total $37,072.29, but Ms. Morris has requested only $29,554 in restitution. Because the government has been unable to resolve this discrepancy, it will simply utilize her request amount for restitution purposes.

| Lot | M&I Loss | Academy Loss | Lundin Loss | Morris Loss | Defendant Involved |
|---|---|---|---|---|---|
| 3-A/CH | | | | | - |
| 3-B/CH | $153,769.18 | | | | Crandell, Whitman, Leastman |
| 4-B/CH | | | $21,236.41 | | Crandell, Whitman, Leastman |
| A-1/QC | | $167,878.72 | | | Crandell, Leastman |
| B-5/QC | $261,000.00 | | $21,236.41 | | Crandell, Leastman |
| B-4/QC | | $214,989.31 | | | Crandell, Leastman |
| B-2/QC | | | | | Crandell, Leastman |
| A-2/QC | | $204,989.31 | | | Crandell, Leastman |
| A-3/QC | | $204,989.31 | | | Crandell, Leastman |
| A-4/QC | | $204,989.31 | | | Crandell, Leastman |
| 4-A/G | | | | | |
| 5-A/G | $293,758.16 | | | $29,554 | Whitman, Leastman |
| 3-A/G | | | | | |
| 1-A/G | | | | | |
| 5-B/G | $359,643.67 | | | | Whitman, Leastman, Crum |
| 2-A/G | $296,361.18 | | | | Whitman, Leastman |
| 1-B/G | | | | | |
| **TOTAL** | **$1,364,532.19** | **$997,835.96** | **$42,472.82** | **$29,554** | |

Thus, as for M&I Bank, the Court should award restitution in the amount of $1,364,532.19. LEASTMAN should be held jointly and severally responsible for that entire amount (because she participated in all five transactions that caused M&I Bank to suffer losses). CRANDELL should be held jointly and severally liable for $414,769.18 (*i.e.,* the losses associated with Lot 3, Parcel B in Chandler Heights and Lot B-5 in Queen Creek). WHITMAN should be held jointly and severally liable for $1,103,532.19 (*i.e.,* all of the M&I Bank transactions except for Lot B-5 in Queen Creek). Finally, CRUM should be held jointly and severally liable for $359,643.67 (*i.e.,* the loss flowing from Lot 5, Parcel B in Gilbert).

Next, as for Academy Mortgage, the Court should award restitution in the amount of $997,835.96. LEASTMAN and CRANDELL should each be held jointly and severally liable

14

1. for that entire amount, because both defendants participated in all of the transactions that harmed Academy Mortgage. By contrast, WHITMAN and CRUM should not bear any responsibility for Academy's losses.

As for <u>Mr. Lundin</u>, the Court should award restitution in the amount of $42,472.82. LEASTMAN and CRANDELL should each be held jointly and severally liable for that entire amount, because both defendants participated in the two transactions that harmed Mr. Lundin. WHITMAN should be held jointly and severally liable for $21,236.41 because he participated in only one of the two transactions. CRUM should not bear any responsibility for Mr. Lundin's losses.

Finally, as for <u>Ms. Morris</u>, the Court should award restitution in the amount of $29,554. LEASTMAN and WHITMAN should each be held jointly and severally liable for that entire amount, but CRANDELL and CRUM should not.

Respectfully submitted this 26th day of April, 2010.

                DENNIS K. BURKE
                United States Attorney
                District of Arizona

                */s Dominic Lanza*

                RAYMOND K. WOO
                DOMINIC LANZA
                Assistant U.S. Attorney

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Mark Hawkins; Greg Clark; Brian Strong; Fred Petti; Mark Berardoni.